UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

TRAVIS DELANEY WILLIAMS,

        Plaintiff,

      v.                                        Case No. 19-C-1174

JAMIE ADAMS, et al.,

        Defendants.

---

## DECISION AND ORDER

---

Plaintiff Travis Delaney Williams, a prisoner who is representing himself, is proceeding on Eighth Amendment claims against Jamie Adams, Jolinda Waterman, and Sandra McArdle. Adams and Waterman were employed by the State of Wisconsin at the relevant time, so they are represented by the Wisconsin Department of Justice. McArdle worked for an agency that contracted with the State, so she is represented by separate counsel. On August 20, 2020, Defendants filed their motions for summary judgment. ECF Nos. 157, 162.

About a week later, Williams filed a motion asking the court to extend his response deadline by thirty days. ECF No. 167. He explained that State Defendants had attached about 3,000 pages in support of their summary judgment motion. Included in those documents were just over sixty pages that were not relevant to his case and included information about other prisoners. Williams attached the unrelated documents to his motion. That same day, State Defendants responded to Williams' motion by asking the court to seal the unrelated documents because many of them contained prisoners' private information, including dates of birth and medical records. ECF No. 169.

The next day, State Defendants supplemented their response to explain that counsel's legal assistant had printed the summary judgment materials to mail to Williams. ECF No. 170. Those materials included more than 3,000 pages of documents. When the legal assistant grabbed the documents from the printer, she accidentally grabbed additional documents that were related to other cases. The unrelated documents became mixed in with the summary judgment materials sent to Williams. Counsel for State Defendants explained that, as soon as she learned about the error (from Williams' filing), she worked with institution staff to remove the unrelated documents from Williams' possession and she moved to seal the documents. She stated that it was her understanding that Williams was without his legal paperwork for one day while institution staff located the documents and ensured no other copies existed.

In the meantime, Williams moved to extend his deadline to respond to McArdle's summary judgment motion. ECF No. 172. On August 31, 2020, the court granted Williams' motions for an extension of time, extending his deadline to respond to both summary judgment motions to October 21, 2020. ECF No. 177.

Later that day, Williams filed a second motion for an extension of time and a motion for sanctions against State Defendants' counsel, Assistant Attorney General Jennifer Remington. ECF No. 178. Williams, who referred to himself as a "pro se victim plaintiff," asks the court to give him the justice he deserves by striking State Defendants' summary judgment motion and setting this matter for trial. Williams explains that, on August 26, after he filed the unrelated documents in support of his first request for an extension of time, he left his cell for recreation. He returned about twelve to fourteen minutes later to use the washroom, at which time he noticed the doors to his housing wing were closed. He says he proceeded down another wing and was able to see that two officers were searching his cell "in a very callous destructive manner." *Id.* at 2. Williams

says he demanded to see a supervisor and told the officers they would "not get off this unit with all his property without a supervisor." *Id.*

Williams asserts that a supervisor eventually came but "refused to look at the destruction in [his] cell[;] bed torn apart[,] covers on the floor[,] pictures torn off the wall of family & friends[,] t.v. thrown around[,] keyboards dropped, tags torn off the brand [new] key board bag." ECF No. 178 at 2. Williams asserts they took many items, including his:

> Norelco electric razor, the cord, art supplies such as black tag board 100 sheets, 100 sheets of white tag board, 5 multicolor pens, 300 sheets of typing paper, 20 sheets of carbon paper, the rules of civil procedure book, 2 self help litigation manuals, construction art paper, a Bible, a concordance, canteen commissary food items of 7 ramen noodles, 4 bags of instant coffee, 1 tuna pouch, one bag and one 1/2 bag of white rice, 1 bottle of hotsauce, 2 pairs of sweat pants, 2 pairs of thermal underwear, 2 sweatshirts, 4 T shirts, 4 pairs of socks, 4 pairs of under wear [sic] [,] a mouth guard and a mouth guard case, a burgundy large bath towel, 1 scrotol [sic] supporter, one jock strap athletic supporter[,] a large rubber mat chess set with large chess pieces, a jar of peanut butter, 2 large bottles of amino acids, one bottle of multiple vitamins for seniors, one bottle of garlic oil pills, one bottle of vitamin C pills[,] one box of denture tablets, one bottle of level one body wash, 2 bars of Safe Guard soap, 1 bottle of CK one lotion, one bottle of dial lotion, one bottle of Gillet after shave skin conditioner[,] 1 jar of Burgumont [sic] hair condition.

*Id.* at 2–3.

Williams also asserts that the officers confiscated legal documents relating to his other pending and past cases, his entire medical file from 2009 through 2019, his psychiatric records from the same timeframe, and eight years of Social Security Administration documents. Williams points out that many of those documents are protected by HIPPA. Williams says the officers also confiscated his notebooks, photo album, college transcripts and test scores, and personal letters he wrote to a spiritual advisor. ECF No. 178 at 3–4. Williams concedes that at about 9:00 p.m. on the night of the search, staff returned a large stack of documents to him, but he says he was still missing "at least 25,00[0]" (the last zero is cut off in the filed copy) pages of documents.

3

Williams asks for additional time to respond to the summary judgment motions, explaining that officers "will not put documents back in their envelopes nor will they keep them in the proper sequence." ECF No. 178 at 5. He asks for five months to put the documents back in order and respond to Defendants' motions. Williams also notes that, to the extent the court ordered officers to confiscate documents from him, such orders would amount to judicial misconduct and I should recuse myself. He also accuses AAG Remington of contacting the institution and ordering them to confiscate every piece of paper out of his cell. He asks the court to sanction her for causing delay and imposing significant hardship on him.

Williams followed up his motion with a flurry of other filings, including his and other inmates' declarations, two motions to compel, and multiple reply briefs addressing Defendants' response. In one of his declarations, Williams explains that he "had to disrupt the normal operations of the facility just to get an answer of why his cell was being tossed." ECF No. 183 at 2. He says an officer told him that he was told by "Ellen Ray [the litigation coordinator] who was told by the DOJ and courts to toss [his] cell and confiscate every piece of paper in [his] cell [i]ncluding and not limited to family photos & personal letters." *Id.* In one of his motions he asks the court to compel the production of video that would show the confiscation of his belongings as well as a Lieutenant Matthew Scullion "holding an O.C. can in his hand all the while [Williams] was telling him his cell is being destroyed." ECF No. 188 at 1. Williams also states he is "now in segregation out of retaliation for complaints against Mary Taylor's actions on 5/26/20." *Id.* According to Williams, he was still getting documents back as of August 31, 2020, and that, as of September 8, 2020 (the date he signed his motion), there were "still many of his documents . . . missing and . . . none of his documents w[ere] in sequence when he got them back . . . ." *Id.*

On September 11, 2020, State Defendants responded to Williams' motion for a five-month extension and his motion for sanctions. ECF No. 191. AAG Remington again explains how the unrelated documents were accidentally included with State Defendants' summary judgment materials. The documents contained private and personal health information of other people, inmates and non-inmates. AAG Remington notes that Williams did not contact her about the error; instead, he efiled the unrelated documents, making other people's private information public. When AAG Remington saw the filing, she immediately consulted with her supervisors, who told her to move to seal the documents and to contact staff at Williams' institution to have them remove the documents from Williams' possession.

AAG Remington called Ellen Ray, the litigation coordinator, and told her what had happened. She then emailed Ray a copy of the documents Williams had filed and asked her to have staff retrieve the documents from Williams. Ray was working from home that day, so she called Captain Daniel Leffler and emailed him a copy of the documents so staff would know what documents to confiscate. Captain Leffler contacted Lieutenant Matthew Scullion and told him Williams had erroneously received documents belonging to other inmates. He emailed Lieutenant Scullion a copy of the documents staff were to look for.

Lieutenant Scullion called Sergeant Cyle Ward and told him to review Williams' paperwork to look for the documents that did not belong to him. Sergeant Ward told Lieutenant Scullion he had just efiled documents for Williams that morning, which he had not yet returned to Williams. Sergeant Ward and Lieutenant Scullion reviewed the unreturned documents and confirmed they were the documents to be retrieved. Still, Lieutenant Scullion believed it necessary to remove and search all of Williams' paperwork in case he had made copies of the documents. He instructed correctional officers Mary Taylor and Dylan Leffler to perform the search. Because

5

Williams has so many papers in his cell, Lieutenant Scullion instructed the officers to remove the papers from his cell and bring them to the security suite to examine.

Officer Taylor knows Williams and knows that he generally has a negative attitude toward staff and is easily angered. Officer Taylor did not want to create a situation where Williams refused to leave his cell, so she confirmed with Lieutenant Scullion that she could wait until recreation to search his cell. Officer Taylor decided to perform a full cell search because, according to Officer Taylor, Williams was due for one anyway.

After Williams left for recreation, the recreation door was secured so Williams could not regain access to his range or cell through that door. Officer Taylor asserts that, for safety and security reasons, she did not want Williams to have access to his cell or to her and Officer Leffler while they searched his cell. Officers Leffler and Taylor entered Williams' cell and stacked Williams' paperwork and two totes containing paperwork on a cart. They say they did not know at that time that the totes contained non-paper items.

At some point, Williams returned and saw that his cell was being searched. He pounded on the recreation door and screamed at them. He then went through the outside recreation area and up another range to the sergeant's station where Sergeant Ryan Neis told Williams that Lieutenant Scullion directed the search. Sergeant Neis secured the range door, and Williams began pounding on the door, screaming profanities, and flipping off the officers. Sergeant Neis called Lieutenant Scullion to come help.

When Lieutenant Scullion arrived, Williams was belligerent and yelling profanities, including, "That bitch Taylor, that cunt Taylor." ECF No. 191 at 7. Williams wanted Lieutenant Scullion to stand near him (presumably so he could see the officers searching his cell), but Lieutenant Scullion refused because Williams was angry, agitated, and yelling. Eventually,

6

Lieutenant Scullion convinced Williams to come to the sergeant's station so he could explain the reason for the search.

Lieutenant Scullion explains that he told Williams he had documents from the court that he was not allowed to have. Lieutenant Scullion says he mentioned the court because he thought the documents were court documents and the court needed them back. He asserts that no one told him this; he just made an assumption based on the limited information he had. Lieutenant Scullion explains that Williams had a pen clenched in his hand, and he began to creep toward Lieutenant Scullion in his wheelchair. Lieutenant Scullion says he was concerned, so he dropped his right leg back to stand in a principles of subject control position, called for backup support officers, and unbuckled his incapacitating agent from the holster on his belt. Lieutenant Scullion held his hands and the incapacitating agent at his belt buckle in case he needed to use it.

Eventually, Williams agreed to move to another range to wait for Officers Leffler and Taylor to leave his cell. Lieutenant Scullion went to Williams' cell to check on the search. He asserts that the cell was not in disarray—staff had not tossed or thrown Williams' paperwork or property. Given Williams' claims, Lieutenant Scullion decided to photograph Williams' cell after the search. *See* ECF No. 192-1.

Staff brought the cart with Williams' paperwork and totes to the security office. Officers Leffler and Taylor reviewed Williams' paperwork. They assert they tried to keep the paperwork in order as best they could. They did not throw any paperwork away. Officer Taylor set aside a few documents (she does not define "a few") she was unsure about with a sticky note for Lieutenant Scullion.

Later that evening, Officer Taylor took the cart with Williams' totes of personal items and several stacks of documents back to Williams' housing unit to return them to him. Unit staff told

7

her that Williams was holding his shaving razor hostage until he received his property back. Officer Taylor gave the cart to unit staff; Officer Clay Spooner gave the items back to Williams.

The next day, on August 27, Captain Leffler returned to work early and saw that some of Williams' paperwork was still in the security suite. Ray went to the security suite, took the papers that Williams had efiled, and told staff to immediately return the rest of Williams' paperwork to him. Ray says she knew Williams was angry, so she went to his cell to talk to him. She told him the papers he had efiled were the only ones being confiscated. While she was talking to him, an officer returned what Ray believed was the rest of Williams' papers. She later learned about the few papers that had been set aside for review. Ray said they should be returned to Williams immediately, so Lieutenant Scullion returned them to Williams. The only property that was confiscated were the documents Williams efiled. All other property, including all of Williams' paperwork was returned to him.

A few days after the search, Officer Taylor was delivering property to Williams' unit when he came down range yelling at her. Officer Taylor asserts that she directed Williams to back away from her. She says that he refused to follow her orders to return to his cell and that he threatened her. According to Officer Taylor, Williams yelled profanities and threats like, "You fucking bitch, I outto [sic] punch your mothern [sic] face in so you can't come back to work and then I won't have to look at you [sic] bitch ass face," and "You cunt ass bitch, I'll get you some day, you won't forget." ECF No. 191 at 12. Officer Taylor wrote Williams a conduct report for his actions.

On September 16, 2020, Williams filed a reply in support of his motion for an extension of time and sanctions. ECF No. 200. A couple of days later, State Defendants supplemented their response to alert the court to the tone of Williams' communications with AAG Remington and Ray. ECF No. 202. A couple days after that, on September 22, 2020, Williams filed a response

to State Defendants' supplemental filing (ECF No. 204) and another lengthy reply to State Defendants' initial response (ECF No. 205).

Williams requests that the court impose "harsh sanctions," including striking State Defendants' summary judgment motion, and that it stay this case, schedule it for trial, and recruit counsel to represent him. He points out that there was no need to search his cell given that he did not have possession of the unrelated documents after he efiled them. He also insists that the officers "trashed" and "destroyed" his cell and that the manner in which they searched his cell differs significantly from the way monthly searches are typically conducted. ECF No. 205 at 5–6; 12–14; 15. He points out that pictures were removed from the wall and thrown away, his clothing was piled on a chair, books were removed from his desk and placed on his bed, which had been stripped of its sheets, important papers were thrown away after being mischaracterized as trash, food items were opened and left to spoil, and his CPAP's water tank was cracked when it was thrown on the floor. *Id.* at 5–6; 20–21.

Williams also objects to officers reading through his private papers, including confidential settlement agreements, health records, and personal letters. And, contrary to the officers' statements, Williams says he "sat in his wheelchair and spoke calmly to Lt. Scullion before and after his property was callously loaded on the cart." *Id.* at 14; 27. Williams also asserts that officers staged his cell for the photographs and altered the video to cover up the fact they had thrown his items on the floor. *Id.* at 25–26.

Williams also disputes Officer Taylor's account of his actions that led to her writing him a conduct report. He asserts that he was sitting at his desk drinking coffee when she came to his cell and began to taunt him about having his property. Shortly thereafter, when Williams was let out of his cell for group, he unintentionally surprised her in the hallway. She panicked, backed away

9

and told him to go to his cell. He replied that he did not have to and left. He asserts that her son was the hearing officer and disregarded discrepancies in her account of what happened.

### THE COURT'S ANALYSIS

AAG Remington concedes that unrelated documents containing other people's personal information were sent to Williams by mistake. Williams knew it was a mistake. He also knew that the private information of people who have nothing to do with this case should not be in his possession or made available to the public. He himself emphasized errors that McArdle's lawyer made when he accidentally sent Williams authorization forms for other inmates—and those forms contained nothing other than the inmates' names. *See* ECF No. 136 at 1–2. Williams could have contacted AAG Remington to alert her to the error, he could have taken the documents to Ellen Ray or the law librarian, he could have informed the court of what happened without attaching the documents, or he could have returned the documents to AAG Remington with assurances that he had not made copies. But Williams did not try to resolve this error in a constructive way. Instead, he efiled the documents without redactions, making public what he knew should have remained private.

How was AAG Remington to respond? By efiling the unrelated documents, Williams demonstrated his willingness to leverage other people's errors and bad luck to his advantage. AAG Remington had to ensure that the private information was removed from Williams so he would not further misuse it. His actions confirmed that she could not trust him to safeguard other people's private information. As the situation demanded, she promptly contacted Williams' institution and asked that the documents be removed from his possession. She deferred to prison officials to determine the best way to accomplish that. She did not, contrary to Williams' assumptions, order

10

that every piece of paper in his cell be confiscated or that his cell be tossed and destroyed. She simply wanted the unrelated documents out of Williams' hands.

AAG Remington calling Ray to ask her to remove the documents from Williams was reasonable and appropriate. She did not request a cell search, she did not have contact with the officers who decided to perform the search, and she did not direct anyone to confiscate Williams' property. Williams' assertions that she knew what would happen and that she has conspired throughout this case with prison staff to delay resolution and inflict hardship on Williams is not supported by any evidence.

Williams points to his communications with business office staff regarding their refusal to provide him with copies of documents as evidence of this "conspiracy." This accusation has been addressed multiple times. At issue is a two-page report (out of thousands of pages of a medical record that has been given to Williams free of charge) prepared by a student practitioner on February 19, 2019. ECF No. 175 at 2. AAG Remington has represented that State Defendants already produced the relevant documents. *See* ECF No. 156. Williams disputes this and insists she has produced only the addendum to the report, which was prepared by McArdle. *See* ECF No. 176-1 at 2–3. Williams asserts he wants the students' report, not McArdle's, and he insists AAG Remington is working with business office staff to ensure he is denied a copy of it.

McArdle's February 26 addendum states, "Follow up visit done by Cody Burnet, RN, NP student with provider present. PT agreed to student evaluation. Evaluation, plan, documentation *reviewed and signed by this provider.*" ECF No. 176-1 at 2 (emphasis added). That addendum is then followed by a progress note report of the February 19 examination, which is signed by McArdle. Thus, it appears—as AAG Remington has repeatedly assured the court—that Williams has had the report all along. His error was assuming that a separate report with Burnet's signature

11

exists. But Burnet was a student, so his report was reviewed, approved, and signed by McArdle (Williams' provider) as she indicates in her addendum; the report was *not* signed by Burnet. Thus, Williams has apparently had the report for many months now, meaning there is nothing to suggest that AAG Remington and prison officials are conspiring to deny him relevant documents.

Given that AAG Remington's decision to retrieve the unrelated documents from Williams was reasonable and given that she did not participate in determining how those documents would be retrieved, the court will deny Williams' motion for sanctions (ECF No. 178). The court also will deny his motion for reconsideration regarding the production of the February 19 report prepared by the student practitioner (ECF No. 175). As noted, it appears to the court that Williams already has this report. To the extent a separate report prepared by Burnet exists, the court has already ordered State Defendants to produce it.

The court will now turn to Williams' complaints about the way officers (none of whom are defendants in this case) searched his cell. Officer Taylor explains that she decided to do a full search of Williams' cell because he was due for one anyway. Williams concedes that officers regularly search prisoners' cells, and the law is clear that prisoners have no reasonable expectation of privacy in their cells. *See Hudson v. Palmer*, 468 U.S. 517, 524–30 (1984). As such, the fact that officers opted to do a full search of Williams' cell rather than simply confiscate the unrelated documents is not problematic.

Williams' real frustration is with the manner in which the officers performed the search. He asserts that they "tossed" and "destroyed" his cell, threw his property on the floor, ruined his food by opening sealed containers, and threw away irreplaceable photographs of family and friends. He asks the court to compel the production of video and logs so it can get a full picture of what occurred. The officers dispute Williams' characterization of the search. Those involved

12

filed declarations explaining in detail what happened that day and why they did what they did. They also provided photographs of Williams' cell and a thirty-minute video of the search.

Williams' characterization of how the officers conducted the search and the condition in which they left his cell is not supported by the photographic and video evidence. The court observed no evidence of them "callously" handling his property, throwing anything away, or putting items on the floor. The video does not show papers being crumpled or haphazardly stacked or thrown away. As the officers indicate and as Williams describes, Williams has a lot of property in a small space, which required the officers to move items around during the search. It is true that officers did not put the items back where they found them, but they did stack them relatively neatly on a chair and on Williams' bed. Officer Leffler explains that no one benefits from a sloppy cell search. ECF No. 196 at ¶ 13. Something could be missed or the prisoner could become angry, which puts officers and others at risk. *Id.* The search may have created work for Williams, which is unfortunate, but not such a hardship that the court can conclude the manner in which officers conducted the search was unreasonable. And, in any event, it appears Williams received help from someone after the search to help him clean and reorganize his living space.

According to Williams, the manner in which the officers searched his cell differed from how monthly cell searches are typically performed. For example, he states that sheets are not normally removed from an inmate's bed and pictures are not taken off the walls. This may be, but just because officers conducted a more thorough search this time than they have in the past does not mean this search was unreasonable. As far as the officers knew, Williams potentially had possession of documents he was not supposed to have, so perhaps they believed a more thorough search was warranted. Williams also asserts that the photographs of his cell were staged and the video was altered, but the court did not observe any irregularities in that evidence to support those

13

claims. The court finds that the evidence confirms the officers' sworn statements regarding how they performed the search and the condition in which they left Williams' cell.

Williams also disputes the officers' characterization of his response to the search. He says he sat calmly in his wheelchair as he spoke to Lieutenant Scullion and that officers' sworn statements that he was yelling, using obscenities, and agitated are untrue. Considering Williams' well-documented past behavior, his description of his response to the search is not credible. Back in February, the court made the following comment:

> The court has observed that the documents Williams files in support of his motions are often riddled with obscenities, vulgarities, and insults. *See* ECF No. 35-1 at 1–2; ECF No. 89-1. The court will not tolerate this behavior, regardless of whether it is directed at the court or at prison staff. The court cautions Williams to communicate with the court and prison staff in a professional and respectful manner. If he does not, he risks sanctions, up to and including dismissal of this case.

ECF No. 94 at 2 n.1.

Further, AAG Remington has highlighted her concerns over Williams' communications multiple times. *See* ECF No. 191 at 16 (citing her "first hand experience of receiving unkind, accusatory, insulting, and harassing letters"). She also provided the court with recent communications from Williams to Ray in which he called Ray an "old decrepit Bastard," a "piece of white trash," a "piece of garbage," and a "decrepit old dried up as[s] Bitch." ECF Nos. 202, 203-1. In response, Williams said, "[T]his is how I talk in my world on the inside of these prison walls," and "this is how I live my life in my world[;] I will never succumb to be controlled, tamed, trained by no one." ECF No. 204 at 3, 2. Williams received a conduct report for his comments to Ray. ECF No. 208-1. The conduct report noted that Williams had been found guilty of the same or similar offense before.

14

Given Williams' past behavior and style of communication (which often was in response to innocuous slights such as failing to correctly forward a document, *see* ECF No. 35-1), it defies belief that Williams would sit in his wheelchair and calmly talk to officers as he observed what he characterizes as the destruction of his cell. The court therefore credits the officers' sworn statements describing Williams' response to the search.

The court also takes issue with Williams' assertion that "this is how he talks in his world." Williams' suggestion that he is unable to control his temper or his style of communication is undermined by the many interactions the court has had with Williams over the years. In every appearance before the court, Williams has been measured, composed, and controlled—even when the court has ruled against him. He always presents his points thoughtfully and respectfully when disagreeing with opposing counsel's arguments. Thus, the court has no problem concluding that Williams is in total control of his communication style.

The court already warned Williams once that it will not tolerate him intimidating and harassing others by using obscenities, vulgarities, and insults. It makes no difference to the court if Williams is directing his abuse at the court, opposing counsel, or prison staff who are facilitating his litigation efforts. This is the last warning the court will give Williams. If the court learns that Williams is continuing with this misconduct, the court will sanction him, up to and including dismissing this case.

Williams is also upset that officers read his personal papers, including confidential settlement agreements, health records, and social security documents. The court understands Williams' concern but believes it is misplaced. Officers were not *reading* Williams' private information. They explain they were tasked with scanning a large number of documents quickly to determine only whether the documents belonged to Williams. By Williams' own account, he

15

has stacks of papers multiple feet high. He explains that many papers were returned to him the evening of the search, and officers assert that all but a few documents were returned to him the following day. Only a small number of officers reviewed the stacks of papers (not AAG Remington or any of the State Defendants). Given the scope of the review and the short timeframe in which the officers performed the review, there appears to be no merit to Williams' concern that officers Taylor and Leffler were doing anything other than simply confirming all the documents were his. Williams asserts that he should not have had to reveal his confidential information simply because AAG Remington mistakenly sent him other people's confidential information. The court reminds Williams that it was not his receipt of that information that prompted the review of his papers; it was the fact that he chose to make that information available to the public by efiling it. In his many filings about the cell search, Williams never takes any responsibility for that decision.

In short, the court is satisfied that the officers' decision to search Williams' cell, the manner in which they searched Williams' cell, and the manner in which they interacted with Williams' were reasonable.

The final issue is whether another extension of the deadline by which Williams must respond to Defendants' motions for summary judgment is warranted. The court thinks not. The court already granted Williams' a one-month extension. The current deadline for him to file his response materials is October 21, 2020. Williams complains that all his papers are out of order, but based on Officer Taylor and Leffler's sworn description of how they conducted the search, the court believes Williams is overstating the condition his documents are in. Even if they were slightly out of order, he has had weeks to put them back in order. That he decided to spend his time filing multiple briefs and declarations about this cell search rather than organize his

16

documents and prepare his response materials does not mean the court should further delay the resolution of Defendants' motions. This case has been pending long enough, and the court and Defendants have been extremely patient and accommodating of Williams' many requests for extra time. Further delay is not warranted.

**IT IS THEREFORE ORDERED** that Williams' motion for reconsideration (ECF No. 175), his second motion for extension of time and his motion for sanctions (ECF No. 178), and his motions to compel (ECF Nos. 188, 201) are **DENIED**.

Williams' materials in response to Defendants' motions for summary judgment (ECF Nos. 157, 162) are due **October 21, 2020**. Failure to respond to the motions is sufficient cause for the court to grant the motions. Civil L.R. 7(d).

Dated at Green Bay, Wisconsin this 30th day of September, 2020.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge