TRAVIS DELANEY WILLIAMS,

      Plaintiff,

     v.                                   Case No. 19-C-1174

JAMIE ADAMS, et al.,

      Defendants.

## DECISION AND ORDER

Plaintiff Travis Delaney Williams, a prisoner who is representing himself, is proceeding on Eighth Amendment deliberate indifference claims against Defendants Jamie Adams, Jolinda Waterman, and Sandra McArdle. He is also proceeding on a First Amendment retaliation claim against McArdle. During the relevant time, McArdle, a nurse practitioner, was Williams' primary care provider at Wisconsin Secure Program Facility, where Williams is incarcerated. On August 20, 2020, McArdle moved for summary judgment.[1] Her motion is fully briefed and ready for the court's decision.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson*

---

[1] Adams and Waterman, who are represented by separate counsel, also moved for summary judgment on August 20, 2020. The court resolved their motion in a separate decision.

*v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)).

Under Civil Local Rule 56, a party must include with its motion a statement of proposed material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to judgment as a matter of law. The court will consider only proposed facts and responses to proposed facts that are clearly supported by admissible evidence in the record.[2] *See Jenkins v. Syed*, 781 F. App'x 543, 544–45 (7th Cir. 2019). In response to a properly supported motion for summary judgment, the party opposing the motion must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*

Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**BACKGROUND**

Before being incarcerated, Williams was shot in the arm and in both legs multiple times, and he was involved at least three car accidents that resulted in injuries to his back, legs, knees, and chest. Dkt. No. 145 at 5–6. He explains that these injuries, along with others that occurred over the years, have led to numerous painful conditions. *Id.* at 6. Williams suffers from

---

[2] Most of Williams' proposed facts and responses to Defendants' proposed facts contain speculation or legal conclusions and/or rely on inadmissible hearsay or haphazardly cite to medical records that do not support his proposed fact or response.

osteoarthritis, degenerative joint disease, bursitis, rheumatoid arthritis, nerve damage, heel spurs and foot deformity, chronic headaches, chest pain, ear pain, and testicular cysts. *Id.* at 11.

Williams was transferred to the Wisconsin Secure Program Facility in 2017. *Id.* at 3. McArdle began as his primary care provider in May 2017. *Id.* at 5. Williams saw her one to two times per week. *Id.* at 24. McArdle stopped working at Williams' institution in November 2019. Dkt. No. 159 at ¶ 7. Williams asserts that her care was inadequate from the beginning and only got worse. Dkt. No. 145 at 7. He does not complain about a particular interaction or her treatment of a particular condition; instead, he alleges that her overall care for his many conditions was constitutionally inadequate.

1. **Ear Issues**

Williams complained of ear pain, popping, drainage, and hearing loss. Dkt. No. 263 at ¶ 13; Dkt. No. 145 at ¶ 13. McArdle and other health care providers prescribed over-the-counter ear drops and a cream, his ears were flushed, he was referred to at least five specialists, including an otolaryngologist and a couple audiologists, and he eventually received hearing aids. Dkt. No. 145 at 12–15; Dkt. No. 263 at ¶¶ 13–14; Dkt. No. 159 at ¶¶ 45–49.

2. **Feet and Legs**

Williams asserts that, when he entered WSPF, he had heel spurs, feet swelling mostly at night but sometimes during the day, and a bunion on his right foot. Dkt. No. 145 at 15. He says those conditions worsened—in part due to McArdle's refusal to immediately provide him with orthotic shoes—to include four bunions and deformity in both feet. *Id.* Williams also suffered from osteoarthritis in his ankles, deep vein thrombosis, and nerve damage. *Id.* at 16.

For his feet, Williams was referred to a podiatrist and received physical therapy. Dkt. No. 263 at ¶ 11. He also had his feet x-rayed to determine if there were bone-related issues, he received

cortisone shots in his heels, he was given custom, molded orthotics, and a podiatrist debrided calluses from his feet. *Id.* On June 14, 2017, after Williams complained to McArdle that his specially-ordered shoes were too tight, McArdle wrote an order for a wider shoe. Dkt. No. 159 at ¶ 55. A few months later, a podiatrist wrote an order for a new shoe size, which Williams received on December 8, 2017. *Id.* at ¶¶ 56–57. Williams continued to complain about the fit of his shoes, and two other health care providers ordered different shoes for him. *Id.* at ¶¶ 58–66. McArdle recommended Williams wear extra socks on his smaller foot, and she wrote an order to measure Williams' left foot after he expressed concern that his feet were two different sizes. *Id.* at ¶ 61.

For his deep vein thrombosis, Williams was sent to the Gundersen emergency room and was prescribed an anticoagulant. Dkt. No. 145 at 16.

### 3. Testicle Issues

In 2004, when Williams was incarcerated at Menard Correctional Center, he was diagnosed with cysts on his testicles. *Id.* In 2015 an ultrasound was performed, which indicated small cysts on Williams' right testicle with doubtful clinical significance. *Id.* Williams asserts that his testicle issues became very painful; his testicles would swell significantly and hurt so much he could not walk. *Id.* at 18–19. Williams also complained about urinary incontinence and frequent urination. *Id.* at 19.

Beginning in 2017, Williams was referred to UW Urology; he was seen there on September 29 and December 29, 2017, July 24, 2018, and June 21, 2019. *Id.* at 17; Dkt. No. 159 at ¶ 94. UW Urology required Williams to have ultrasounds prior to his urology appointments. Dkt. No. 263 at ¶ 19. UW Urology recommended scrotal supporters, jock straps, compression shorts, and denervation cord block shots and referred him to the pain clinic. Dkt. No. 145 at 17–18. Williams asserts that health services staff refused to follow many of those recommendations, and when they

4

did, it was only after he complained multiple times. *Id.* at 17. McArdle ordered lidocaine cream and a jockstrap for his scrotal pain, reviewed his medical chart, ordered an ultrasound, and ordered follow-up appointments with UW Urology. Dkt. No. 159 at ¶¶ 91–93.

Ultimately, a urologist recommended that Williams receive a cord denervation surgery, which is an elective procedure that had to be approved by the Class III Committee at Williams' institution. Dkt. No. 145 at 19; Dkt. No. 263 at ¶¶ 15–16. Williams asserts that the Committee twice denied the surgery based on the way McArdle worded her referral. Dkt. No. 145 at 19–20.

Williams was approved for a cord denervation surgery at the end of 2018; however, after a deep vein thrombosis incident, he was placed on anticoagulants, and the urologist canceled the surgery because he did not want to perform it while Williams was on anticoagulants. *Id.* at 21; Dkt. No. 263 at ¶ 20; Dkt. No. 159 at ¶ 103. The urologist wrote a letter explaining why the procedure had to be postponed (Williams states he did not receive this letter). Dkt. No. 263 at ¶ 21. The same day as the cancelation, health services rescheduled the procedure. *Id.* at ¶ 22. The rescheduled procedure was canceled because Williams refused the lab work, blood draw, and x-ray that the urologist had ordered to be completed before the procedure. *Id.* at ¶¶ 23–24. On July 12, 2019, McArdle submitted a Class III request for approval of a denervation surgery of Williams' right testicle, but the physician supervisor denied the request because he could not determine whether Williams' function improved when he previously received a nerve-blocking injection. Dkt. No. 159 at ¶ 105.

**4. Shoulder Pain**

Williams complains of pain in his shoulders due to arthritis and impingements in both shoulders. Dkt. No. 145 at 21. He believes his condition worsened because of McArdle's failure to properly respond to his complaints. *Id.* Williams had multiple appointments with orthopedic

5

specialists and received cortisone shots to his shoulders. *Id.*; Dkt. No. 263 at ¶ 27. Williams explains the shots, which were administered by an offsite doctor, were not effective and caused his forearms to swell. Dkt. No. 145 at 22. He also explains that he wanted to see the orthopedist for chronic pain in his ankle, knees, hip, back, and neck, but McArdle limited the referral to his shoulders. *Id.* Williams concedes that he has "no idea what c[ould] be given to [him] or what could be done to eliminate that source of chronic pain in any area of [his] body." *Id.*

On November 17, 2017, an orthopedist evaluated Williams' shoulders and noted "full motion bilateral shoulders. Cuffs strong. No atrophy no defect on front shoulder." Dkt. No. 263 at ¶ 28; Dkt. No. 164-1 at 13. He also observed that, based on recent x-rays, Williams' shoulders "appear[ed] unremarkable except for some [osteoarthritis] ac joints right greater than left." *Id.* The orthopedist noted Williams' pain was likely a result of rotator cuff disease. Dkt. No. 164-1 at 13. He observed that a previous shot in one of his shoulders had provided some relief for a while, and he administered a shot in both shoulders. *Id.* Later, Williams complained to a rheumatologist that he believed he had been injected with water instead of cortisone. Dkt. No. 263 at ¶ 29.

On February 14, 2020, Williams was again evaluated by on orthopedist. Dkt. No. 217-1 at 13. He noted that Williams represented that the shots he had received a few months earlier (before McArdle had stopped working at WSPF) had helped. *Id.* He recommended "open distal clavicle excision for the right shoulder," but no "treatment on the left shoulder" until he could review his "op notes and any relevant imagining." *Id.* In early October 2020, Williams had shoulder surgery on his right shoulder. *See* Dkt. Nos. 221 and 217-1 at 13.

   **5. Breathing Issues**

On November 2, 2017, McArdle discontinued Williams' CPAP machine due to non-compliance. Dkt. No. 159 at ¶ 20. The results from the CPAP monitor indicated that Williams

6

had not used his CPAP for the proscribed four hours on any day in the previous thirty days. *Id.* After the health services manager consulted with the respiratory therapist, she sent McArdle a request to renew Williams' CPAP. *Id.* at ¶ 21. Williams received his CPAP machine back on November 17, 2017, just a couple weeks after it was discontinued. *Id.* at ¶ 22.

    **6. Pain Management**

Williams had several referrals to the UW pain clinic, and, according to him, was prescribed medications equaling "530 pills, 9 creams and 8 liquids." Dkt. No. 264 at ¶ 6. On June 30, 2017, McArdle wrote an order for Duloxetine 30mg daily for one week, then Duloxetine 60 mg daily for six months. Dkt. No. 159 ¶ 67. On August 8, 2017, McArdle ordered an increase of Duloxetine to 90 mg daily for six months. *Id.* at ¶ 68.

Although the timing is unclear, Williams asserts that, for about thirty days, he was given 120 mg of Duloxetine by mistake. Dkt. No. 264 at ¶ 10. He asserts that he told the health services manager that this dosage was working for his neck pains. *Id.* at ¶ 9. Williams asserts that after the mistake was discovered, he received no Duloxetine for about sixteen days. *Id.* at ¶ 12. According to Williams, he suffered from serious side effects from abruptly stopping the Duloxetine. *Id.* at ¶ 13. Williams does not present evidence that McArdle made errors in prescribing the Duloxetine, nor does he present evidence to show she was involved in erroneously dispensing the Duloxetine or abruptly stopping the Duloxetine.

Williams eventually resumed taking Duloxetine, but on October 31, 2017, he submitted a health services request stating, "I need to see someone for nerve pain. This D[u]loxetine is no longer working. I want to be weened off of this and given something else." Dkt. No. 159 at ¶ 69. On November 5, 2017, McArdle wrote an order to decrease the Duloxetine to 60 mg daily for one week, then 30 mg daily for one week, then to discontinue. *Id.* at ¶ 70. She also increased his

7

Gabapentin prescription to 800 mg daily for his nerve pain. *Id.* at ¶ 71. Williams received refills of his Gabapentin on November 21 and December 7 and 22, 2017, and January 4 and 14, 2018. *Id.* at ¶ 72. He was then weaned off Gabapentin and began a different nerve pain medication, Pregabalin (Lyrica). *Id.* Williams received refills of Lyrica on January 15, March 12, June 13, September 27, and November 1, 2018. *Id.* at ¶ 73.

On May 4, 2019, corrections officers found a stash of medications, including Lyrica, in Williams' cell. Dkt. No. 159 at ¶ 75. He was written a conduct report and found guilty of medication misuse. *Id.* at ¶ 76. His prescription for Lyrica was discontinued. *Id.* at ¶ 75. McArdle submitted a non-formulary drug request to the Bureau of Health Services' medical director for Gabapentin, but her request was denied on June 20, 2019. *Id.* at ¶ 77. Williams was offered other medication to treat his pain, and he accepted Keppra. *Id.* at ¶ 78. Williams was treated with other medications during this time, including lidocaine gel twice a day, Celebrex 100 mg, Tylenol 650 mg four times per day, and Capsaicin cream twice per day as needed. *Id.* at ¶ 79. Williams is currently back on Lyrica. *Id.* at ¶ 80.

## ANALYSIS

The Eighth Amendment prohibits medical staff from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To determine if the Eighth Amendment has been violated in the prison medical context, [the court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual was deliberately indifferent to that condition." *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017) (quoting *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016)).

A jury could reasonably conclude that Williams' many medical conditions and the pain he suffered as a result of those conditions satisfy the objective seriousness prong of the standard. The question is whether Williams has produced sufficient evidence for a jury to reasonably conclude that McArdle was deliberately indifferent to his conditions and pain. "To determine if a prison official acted with deliberate indifference, [the court] look[s] into his or her subjective state of mind." *Petties*, 836 F.3d at 728. "An official is deliberately indifferent when he disregards a known condition that poses 'an excessive risk to inmate health or safety.'" *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

Williams claims that McArdle's care was inadequate from the beginning and that she should have done more to treat his many conditions, including his issues with his ears, feet and legs, shoulders, breathing, skin, testicles, and chronic pain. The Court of Appeals for the Seventh Circuit has explained that, when considering whether an official's care evidences deliberate indifference to serious medical needs, the court must look at the totality of the care provided. *Id.* The record is full of evidence showing McArdle's many attempts to address Williams' complaints. She evaluated him in health services one to two times per week; she referred him for offsite consultations with specialists in podiatry, audiology, urology, cardiology, pain management, rheumatology, dermatology, orthopedics, respiratory therapy, ENT, and otolaryngology; she ordered (often at specialists' requests) diagnostic testing such as blood draws, ultrasounds, and x-rays; she requested conservative treatments such as ice, jockstraps, and physical therapy; and she adjusted his pain medications, often at his request.

Williams asserts that all of this activity was a sham—he says McArdle conspired with specialists to ensure they would pretend to find nothing wrong with him; she would intentionally word referrals to limit the conditions specialists could consider; she would cancel appointments,

9

medications, and surgeries for no reason; and she would sabotage requests by wording them to encourage denials. Williams presents no evidence to support these accusations. He points only to neutral medical records, which objectively record Williams' complaints and the providers' responses, and his own health services requests and letters, which contain the same unsupported accusations. "Speculation is insufficient to withstand summary judgment; the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Without some evidence that McArdle's many attempts to address Williams' conditions were merely hollow efforts for show, Williams fails to create a triable issue for a jury to decide.

In fact, the record disproves many of Williams' accusations. When a specialist would not diagnose Williams to his liking, McArdle often referred him to another specialist. When his medication was confiscated because correctional officers found a stash in his cell, McArdle placed an order for different medication. When Williams made requests to try a different medication, McArdle accommodated his request. When he called her names and accused her of misconduct, McArdle wrote letters responding to his concerns. When procedures were canceled because Williams refused to comply with requests for lab-work or because the specialist was uncomfortable with proceeding, McArdle made arrangements to reschedule the procedures. Her many efforts, though not perfect, are wholly inconsistent with a finding of deliberate indifference.

Williams, who suffers from chronic pain, wanted immediate and complete relief. He also appears to have wanted to dictate the treatments he would receive and the timetable on which he would receive them. This, however, is not a luxury prisoners (or even non-prisoners) enjoy. *See Drinkwater v. Larson*, 794 F. App'x 523, 527 (7th Cir. 2020) ("prison inmates are not entitled to

10

Case 1:19-cv-01174-WCG   Filed 12/29/20   Page 10 of 13   Document 271

demand specific care"). It is well established that prisoner's disagreement with a medical professional's treatment decisions is insufficient to make out a constitutional claim. *Estelle*, 429 U.S. at 107; *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). And, while Williams did experience some delays here and there in receiving treatment, delays can be reasonable. *See Petties*, 836 F.3d at 730. McArdle has presented evidence showing that many of the delays Williams experienced were a result of Williams refusing to participate in his treatment, of decisions made by specialists and reviewing authorities, of attempting to treat multiple conditions at once, and of operating in a prison setting with limited resources. Based on this record, no jury could reasonably conclude that McArdle was deliberately indifferent to Williams' conditions or that any delay Williams experienced was a result of her deliberate indifference. *See Wilson*, 901 F.3d at 822. McArdle is entitled to summary judgment on Williams' Eighth Amendment claim.

Williams is also proceeding on a First Amendment retaliation claim against McArdle based on his allegations that she refused him treatment and canceled his medication and procedures after he complained about her to health services and her employer. To overcome summary judgment on his First Amendment claim, Williams needed to identify evidence that McArdle was motivated to punish him with adverse actions because he engaged in constitutionally protected activity. *Winston v. Fuchs*, No. 20-1643, 2020 WL 7230248, at *2 (7th Cir. Dec. 8, 2020).

Williams' claim fails to the extent he alleges McArdle's actions were in response to him calling her names and insulting her. "Inmates retain a First Amendment right to complain about prison staff, whether orally or in writing, but only in ways consistent with their status as prisoners. . . . Insubordinate, verbal remarks to prison staff are inconsistent with the status of a prisoner." *Caffey v. Maue*, 679 F. App'x 487, 490 (7th Cir. 2017) (citations omitted). Williams did not engage in protected activity when he called McArdle names and/or insulted her.

11

Even if the court considers only those complaints that were arguably constitutionally protected, Williams' claim fails because he fails to produce evidence for a reasonable jury to find that his complaints were the but-for cause of McArdle's actions. *See Winston*, 2020 WL 7230248, at *2 (citing *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). McArdle presented evidence showing that the cancelation of medication was in response to a conduct report Williams received for misuse of medication, and her cancelation of various procedures resulted from specialists' orders, Williams' refusal to comply with requests for diagnostic testing, or supervising authorities denying her requests. Also, when McArdle canceled medications or procedures, she often provided Williams with alternatives or sought to reschedule the procedures. These actions undermine Williams' speculation that she was motivated to punish or harm him. Thus, McArdle is also entitled to summary judgment on Williams' First Amendment claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** that McArdle's motion for summary judgment (Dkt. No. 162) is **GRANTED**. The Clerk is directed to enter judgment dismissing the case with prejudice.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed

12

within 28 days of the entry of judgment. The court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See id.*

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Green Bay, Wisconsin this 29th day of December, 2020.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge